David C. Roberts, Esq. (ID # 023141991)
Akshar U. Patel, Esq. (ID # 271162018)
NORRIS MCLAUGHLIN, P.A.
400 Crossing Boulevard, 8th Floor
Bridgewater, NJ 08807-5933
*Attorneys for Plaintiffs Julius Realty Corporation,
James J. Westphal, Scott K. Westphal*, U.S. Eagle
*Corporation, JJW Trust, and SKW Trust*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JULIUS REALTY CORPORATION, a New Jersey corporation, JAMES J. WESTPHAL, JR., an individual, and SCOTT K. WESTPHAL, an individual, U.S. EAGLE CORPORATION, a Delaware corporation, JJW Trust, and SKW Trust,  *Plaintiff*,  v.  DAWN E. THOMPSON, an individual,  *Defendant*. | ECF CASE  Civil Case No.:  3:20-cv-04575-MAS-LHG  **FIRST AMENDED COMPLAINT** |

Plaintiffs Julius Realty Corporation, James J. Westphal, Scott K. Westphal, U.S. Eagle Corporation, JJW Trust, and SKW Trust, by and through their attorneys, Norris McLaughlin, P.A., by way of this First Amended Complaint against Defendant Dawn Thompson ("Defendant" or "Dawn") sets forth and alleges as follows:

**PARTIES**

1.  Plaintiff Julius Realty Corporation ("Julius Realty") is a corporation organized under the laws of the State of New Jersey, with a business address of One Gateway Center, Suite 2600, Newark, New Jersey, effective as of April 6, 2020.  Julius Realty's business consists solely of owning and leasing real property in the state of New Jersey.

1

2. Plaintiff James J. Westphal, Jr. ("Jim") is an individual residing in Nevada and is a director of Julius Realty and U.S. Eagle, effective April 6, 2020.

3. Plaintiff Scott K. Westphal ("Scott") is an individual residing in Massachusetts and is a director of Julius Realty and U.S. Eagle, effective April 6, 2020.

4. Defendant is an individual residing in Newport Beach, California and, upon information and belief, is the acting President of Julius Realty.

5. Plaintiff U.S. Eagle Corporation ("U.S. Eagle") is a corporation organized under the laws of the State of Delaware, with a business address of One Gateway Center, Suite 2600, Newark, New Jersey, effective as of April 6, 2020.

6. Julius Realty is the wholly owned subsidiary of U.S. Eagle.

7. Plaintiff JJW Trust ("Jim Trust") is a shareholder of U.S. Eagle. Jim is the trustee of the Jim Trust.

8. Plaintiff SKW Trust ("Scott Trust") is a shareholder of U.S. Eagle. Scott is the trustee of the Scott Trust.

9. Non-Party Dawn E. Westphal Trust ("Dawn Trust") is a shareholder of U.S. Eagle. Upon information and belief, Defendant is the trustee of the Thompson Trust.

10. Non-Party Philip Thompson ("Philip") is the former husband of Dawn.

## FACTS COMMON TO ALL COUNTS

11. Plaintiffs bring this action pursuant to the New Jersey Uniform Declaratory Judgements Law, N.J.S.A. 2A:16-50 et. seq. to obtain judgment rendering the purported "employment and severance agreement" ("Purported Ultra Vires Agreement") dated January 6, 2014 as void. A true and correct copy of the Purported Ultra Vires Agreement, in unsigned form

(as such form is the only known version of the Purported Ultra Vires Agreement), is attached hereto as Exhibit A.

12. Jim, Scott, and Dawn are siblings, and each inherited a certain number of shares of U.S. Eagle, a longstanding family business.

13. In or about June 21, 2005, Dawn, at the approximate age of forty-five (45) and having virtually no business experience whatsoever, sought to become involved in the family business for the first time. Dawn's brothers, Jim and Scott, who had successfully managed the family's enterprises for many years, agreed to allow Dawn to participate in the management of Julius Realty.

14. Around this time, Julius Realty owned several real estate assets.

15. Within a short time of becoming involved in the management of Julius Realty, Dawn began to refer to the company as "her" corporation and its properties as "her babies."

16. When requested by U.S. Eagle or its stockholders to distribute profits of Julius Realty to U.S. Eagle, Dawn refused and blocked all such efforts.

17. Dawn orchestrated a scheme by which Scott would be removed from the Board of Directors of U.S. Eagle. Scott did not receive notice of any meeting of stockholders for the purpose of voting for directors, nor did he receive an opportunity to consent to such action in writing.

18. Despite lack of notice of the purported meeting to elect directors, on or about August 16, 2010, Scott was informed (via letter signed by Dawn as Secretary of U.S. Eagle) that the entire Board of Directors of U.S. Eagle had been removed and replaced with new directors Dawn, Philip, and a third individual named Todd Bearup. Such action was taken in violation of U.S. Eagle's By-laws, and therefore, Scott's purported removal from the Board of Directors of U.S. Eagle was invalid.

19. Jim did not vote for Scott's removal from the Board of Directors of U.S. Eagle, which is significant because the Jim Trust and Scott Trust, collectively, hold the majority of the shares of U.S. Eagle. Jim and Scott, respectively, are the trustees of the trusts bearing their names.

20. Approximately one week later, Dawn (again in her capacity as Secretary of U.S. Eagle) sent a letter to Scott informing him that his employment by U.S. Eagle was terminated, effective August 19, 2010. Dawn even instructed U.S. Eagle's counsel to preemptively sue Scott to require him to return to the company an already fully depreciated vehicle used by him. Up to this point, the family operated business had always awarded an executive's company-owned vehicle upon termination as a conciliatory demonstration of good-faith.

21. Shortly after Scott's removal and termination, U.S. Eagle and its group of subsidiaries, including Julius Realty, entered into bankruptcy proceedings (the "Bankruptcy"), with Dawn primarily controlling the Bankruptcy proceedings on behalf of U.S. Eagle and Julius.

22. Scott was completely excluded from all U.S. Eagle activities and decision-making throughout the Bankruptcy, and Jim was kept on the fringes.

23. Prior to or in connection with the Bankruptcy, Julius Realty disposed of all but three properties. Each had been marketed and posted for sale by the chief restructuring officer engaged by the group of entities. Two of the remaining three were sold soon after the Bankruptcy reorganization. The remaining parcel of commercial real estate is located in Lawrence Township, New Jersey.

24. This property was, and continues to be, occupied by a single long-term tenant pursuant to a triple net lease. As such, Julius Realty's sole business consisted of, and continues to consist of, renting the Lawrenceville property.

25. Due to the triple net lease, such management activities consisted almost entirely of receiving a rent check and depositing the same into the company's bank account - certainly not a time consuming or complicated task.

26. The only other task required to be completed by Julius Realty was to approve environmental remediation plans (as required by the New Jersey Industrial Site Recovery Act and/or Environmental Cleanup Responsibility Act) already prepared by Julius Realty's environmental consultants for the Lawrence Township property. Dawn completely shirked this responsibility.

### A. *Purported Ultra Vires Agreement*

27. As U.S. Eagle and Julius Realty were exiting Bankruptcy, Dawn concocted a self-enrichment scheme by which Dawn purported to cause Julius Realty to enter into the Purported Ultra Vires Agreement, knowing full well that such Purported Ultra Vires Agreement disproportionately and unjustly enriched Dawn relative to the services she would provide to Julius Realty, even if all such services were diligently provided (which they were not). Plaintiffs allege that this document was never executed and, thus, never became effective, but anticipate Dawn taking the position that it is somehow valid and enforceable.

28. In or around November 2013, Dawn lied to U.S. Eagle's then Chief Restructuring Officer, Steven A. San Filippo, by telling Mr. San Filippo that Dawn did not participate in the Board of Director's approval of the Purported Ultra Vires Agreement, knowing full well that Dawn's then-husband, Philip, an interested party, participated in the purported approval process as a director and/or officer of U.S. Eagle and that Dawn had obfuscated the facts regarding the Purported Ultra Vires Agreement in order to convince other directors to approve the same under duress.

29. Upon information and belief, Dawn offered her then-husband, Philip, a very generous divorce settlement around the same time that Philip was tasked with reviewing and approving the Purported Ultra Vires Agreement on behalf of U.S. Eagle and/or Julius Realty.

30. Dawn intentionally withheld information and other material facts related to the Purported Ultra Vires Agreement from all of the directors and stockholders of Julius Realty's sole shareholder (i.e., U.S. Eagle) for the purpose of preventing such individuals from complaining about or otherwise objecting to the Purported Ultra Vires Agreement.

31. For example, the final draft of the Purported Ultra Vires Agreement was not provided to all of the then-current members of the Board of Directors of Julius Realty, nor was the Purported Ultra Vires Agreement provided to or explained to all of the directors and stockholders of Julius Realty's sole shareholder (i.e., U.S. Eagle)

32. As discussed above, Scott's removal from the Board of Directors of U.S. Eagle was invalid, and, therefore, Scott should have been given the opportunity to review, discuss, reject, or propose alternatives to the Purported Ultra Vires Agreement.

33. Dawn caused Julius Realty and/or U.S. Eagle to purchase exorbitant vehicles for Dawn's personal use. Specifically, in at least one instance, Dawn caused Julius Realty to purchase an Aston Martin vehicle for her use, even though she lived in California and Julius Realty's sole business consisted of collecting rent from a commercial tenant in New Jersey.

34. Dawn caused Julius Realty to purchase other exorbitant perquisites that were not necessary or even useful in the performance of Dawn's very limited job duties.

35. The benefits that Dawn granted to herself under the Purported Ultra Vires Agreement are completely unjustified given the limited services Dawn was supposed to provide

(almost all of which she failed to actually provide, and the rest of which she habitually failed to perform correctly and on time).

36. Under the Purported Ultra Vires Agreement, Dawn gave herself an exorbitant annual base salary of "$210,496.00" for collecting and depositing rent checks and filing corporate tax returns. Dawn also awarded herself annual raises although the scope of her "duties" stayed the same and her actual performance of such duties steadily decreased. Even if her salary could have been justified at the outset because of the number of properties Julius Realty owned at the time, her salary is especially exorbitant in light of the fact that, for the past several years, it has owned precisely one piece of real estate.

37. Based on the market rate for Dawn's limited services, her annual base salary and other payments should have been substantially lower, and the difference should have been paid to U.S. Eagle as a distribution.

38. Dawn's exorbitant salary caused Julius Realty to deduct in excess of one million dollars ($1,000,000) from its reportable income from 2014 through the present. In addition, the payments to Dawn would almost certainly be deemed by the IRS to be "excessive compensation" that should not have been deducted in light of the fact that Dawn has near zero actual job responsibilities. Thus, by deducting this excessive salary (which, upon information and belief, Dawn has directed the corporation's independent CPA to deduct), Dawn has put Julius Realty at substantial risk of tax audit and significant penalties.

39. The Purported Ultra Vires Agreement also required Julius Realty to pay Dawn a severance payment in the event that her "employment" is terminated without cause. Such severance payment is grossly exorbitant. It requires Julius Realty to pay Dawn her base salary through January 2021 *plus* one million three hundred thousand dollars ($1,300,000).

40. Dawn also caused the Purported Ultra Vires Agreement to require Julius Realty to transfer to Dawn title to a company-owned vehicle, even though she had, several years earlier, caused U.S. Eagle to sue Scott for the return of a fully depreciated company vehicle then used by Scott.

41. Dawn also caused the Purported Ultra Vires Agreement to provide nineteen (19) weeks of paid vacation – the equivalent of almost five months' vacation.

42. Dawn also caused the Purported Ultra Vires Agreement to provide eligibility for other benefits and bonus payments on top of the already astronomical pay and benefits provided elsewhere in the document.

43. To add insult to injury, Dawn caused the Purported Ultra Vires Agreement to provide for reimbursement of Dawn's personal attorneys' fees incurred in connection with the "negotiation" of the Purported Ultra Vires Agreement.

44. The Purported Ultra Vires Agreement was never signed, executed, or ratified by Julius Realty; however, Dawn has been causing Julius Realty to pay her purported "salary" and other benefits as though the Purported Ultra Vires Agreement were valid (which, to be clear, it is not).

### *B. Breach of Fiduciary Duties*

45. Dawn failed to reasonably and diligently manage the day-to-day affairs of Julius Realty.

46. Dawn concocted a self-enrichment scheme by which Dawn caused Julius Realty to enter into the Purported Ultra Vires Agreement.

47. Dawn's mismanagement to consistently and diligently remediate environmental contamination at the real property owned by Julius Realty has caused this property to languish as a severely reduced marketable /discounted asset.

48. Dawn failed to maintain or provide a log of business miles incurred on the automobile owned by Julius Realty and used by Dawn thereby subjecting the Corporation to potential penalties and interest by the IRS.

49. Dawn failed to maintain adequate channels of communications for Julius Realty, including, without limitation, by frequently failing to answer the sole telephone number maintained for Julius Realty when calls are received and allowing U.S. Eagle's / Julius Realty's sole voicemail box to remain full and unable to accept additional messages.

50. Dawn failed to file necessary and appropriate documentation with the New Jersey Division of Revenue and Enterprise Services and failed to pay the necessary and appropriate fees or taxes to the State of New Jersey in order to maintain the good standing of Julius Realty.

51. Dawn failed to file necessary and appropriate documentation with the California Secretary of State's office and failed to pay the necessary and appropriate fees or taxes in such state in order to maintain the good standing of Julius Realty in such state.

52. Dawn failed to file timely state and federal tax returns for U.S. Eagle and Julius Realty.

53. Dawn failed to convene annual meetings of the shareholder of Julius Realty (i.e., U.S. Eagle) for at least thirteen (13) years prior to the date hereof.

54. Dawn failed to convene regular meetings of the Board of Directors of Julius Realty to review, discuss, and direct the status and activities of Julius Realty.

55. Dawn failed to provide information to Julius Realty's directors regarding the financial status and activities of Julius Realty.

56. Dawn failed to maintain a calendar or other timekeeping methodology to support Dawn's claim that Julius Realty and/or U.S. Eagle owed her approximately $80,000 worth of "vacation pay" as of October 2013, and, upon information and belief, Dawn continues to take paid vacation at will, without maintaining time-records or accounting for the same.

57. Dawn failed to provide information to the directors or stockholders of Julius Realty's sole shareholder (i.e., U.S. Eagle) regarding the financial status and activities of Julius Realty.

58. Dawn caused Julius Realty to unfairly and dishonestly maintain a debenture obligation with Dawn personally, to the sole benefit of Dawn personally, and not to the benefit of the Shareholder or Julius Realty, which debenture existed prior to Julius Realty's and U.S. Eagle's Bankruptcy in or around 2011.

59. Dawn requested and continuously solicited, that Julius Realty pay to Dawn a substantial "success fee" upon spurious grounds.

## COUNT ONE
**(Declaratory Judgment)**

60. Plaintiffs hereby incorporates by reference the averments of all the paragraphs above as though each were fully set forth herein.

61. The Purported Ultra Vires Agreement was never properly executed.

62. In the alternative, if the Purported Ultra Vires Agreement was executed, with the executed version hidden from the Plaintiffs, it was never executed by a person on behalf of Julius Realty with authority to do so, or ratified by Julius Realty, and is thus an ultra vires document..

63. Despite the fact the Purported Ultra Vires Agreement was never executed at all or was neither ratified nor signed by anyone on behalf of Julius Realty with proper authority to enter same, Dawn has been causing Julius Realty to pay her purported "salary" and other benefits as though Purported Ultra Vires Agreement were valid.

64. Plaintiffs and Defendant have a dispute over the validity of the Purported Ultra Vires Agreement and are entitled to a judgment declaring their respective rights.

**WHEREFORE,** Plaintiffs Julius Realty Corporation, James J. Westphal, Scott K. Westphal, U.S. Eagle Corporation, JJW Trust, and SKW Trust respectfully requests this Court enter judgment in its favor and against Defendant Dawn E. Thompson and provide the entry of an Order declaring the Purported Ultra Vires Agreement as void ab initio, having never been validly executed; or, in the alternative, void ab initio as having never been executed or ratified by someone on behalf of Julius Realty with authority to do so, and such other relief as the Court deems just and equitable.

### COUNT TWO
**(Breach of Fiduciary Duties)**

65. Plaintiffs hereby incorporates by reference the averments of all the paragraphs above as though each were fully set forth herein.

66. Directors and officers of a corporation must discharge certain fiduciary duties, which include the duty of care, a duty of loyalty, a duty of disclosure, and a duty of good faith.

67. Dawn, as a director and officer of Julius Realty, owed Julius Realty these fiduciary duties.

68. Dawn breached her fiduciary duties to Julius Realty by, *inter alia*, failing to perform her duties as a director and officer, grossly neglecting her duties as a director and officer, and

committing acts of dishonesty, and committing acts of self-dealing to the direct determinant of Julius Realty, as aforesaid.

69. As a direct and proximate result of Dawn's breach of her fiduciary duties, Julius Realty has suffered, and continues to suffer, irreparable harm and damages.

**WHEREFORE,** Plaintiffs Julius Realty Corporation, James J. Westphal, Scott K. Westphal, U.S. Eagle Corporation, JJW Trust, and SKW Trust respectfully requests this Court enter judgment in its favor and against Defendant Dawn E. Thompson, as follows:

a. Compensatory damages;

b. Incidental and consequential damages;

c. Punitive damages;

d. Forfeiture of all salary paid to her during the time period Dawn breached her fiduciary duty;

e. Rescission of the Purported Ultra Vires employment Agreement;

f. Attorneys' fees; and

g. Such other and relief as the Court deems just and equitable.

Dated:  May 26, 2020	**NORRIS MCLAUGHLIN, P.A.**
	*Attorneys for Plaintiffs*

	By:	/s/*David Roberts*
		David C. Roberts, Esq.